[No. 13541.   Department Two.   March 24, 1917.]

THE STATE OF WASHINGTON, *on the Relation of Northern Pacific Railway Company et al., Appellants*, v. PUBLIC SERVICE COMMISSION *et al., Respondents*.[1]

CARRIERS—REGULATION OF RATES—ORDERS—PRESUMPTIONS. Where an order of the public service commission was not superseded and became effective in twenty days, it will be presumed that it was complied with and therefore it cannot be objected to as too indefinite to be enforced.

SAME—DISCRIMINATION. A joint freight rate upon parallel roads is not shown to be discriminatory as resulting in a loss of all business by one of the roads, where the general freight agent of that road testified that the tariff could be so framed that it would not result in the loss of through shipments but would be available only to certain points.

SAME—REGULATION OF RATES—PUBLIC NECESSITY. Public necessity for a joint freight rate does not depend upon the number of persons asking for the change, and may be based upon the application of but one person.

SAME—REGULATION OF RATES—MILLING PRIVILEGES—JURISDICTION OF COMMISSION. The granting of milling privileges in transit must be without wrongful prejudice to the rights of other shippers, and its control is within the jurisdiction of the public service commission, under Rem. Code, § 8626-53, granting powers similar to those of the interstate commerce commission.

SAME—REGULATION OF RATES — SERVICE — ADEQUACY. A finding that a town was not properly served by a railroad, is warranted, where it appears that the road did not enter the town and the haul from its depot costs sixty cents per ton more than would be involved by another service which could be given by another road.

SAME—REGULATION OF RATES—DISCRIMINATION—DUE PROCESS. A through joint rate, with milling privileges in transit at the town of P., a point on parallel roads, the same as other towns enjoyed beyond the termination of one of the lines, is not a taking of property without due process of law, because of the fact that it would deprive one of the roads of the business of mills located nearer the depots of the other road.

SAME—REGULATION OF RATES—REASONABLENESS—DISCRIMINATION. It is not unreasonable or an abuse of the police power to order a

[1] Reported in 163 Pac. 1143.

through joint rate with milling privileges in transit, affecting traffic upon one hundred miles of parallel railroads, although it was asked for by only one shipper for the purpose of saving thirty cents drayage per ton on traffic, where such shipper was not in as good a condition as before completion of the competing line of railroad, and the town did not enjoy the same privileges as enjoyed by other towns beyond the terminus of one of the roads.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered April 24, 1916, upon findings in favor of the relators, affirming on appeal an order of the public service commission establishing joint railroad rates with milling privileges in transit, on the complaint of a milling company. Affirmed.

*A. C. Spencer, L. B. Da Ponte, Frank C. Owings,* and *John F. Reilly,* for appellants.

*The Attorney General, Scott Z. Henderson, Assistant,* and *B. O. Graham (C. E. Arney, Jr.,* of counsel), for respondents.

HOLCOMB, J. — Upon a complaint by Taylor & Kemp, millers at Prosser, in this state, to the public service commission, proceedings were had resulting in an order by the commission requiring these relators to establish a joint through rate, from Eastern Washington points, on their lines, with milling in transit privilege at Prosser. The relators then instituted their action in the superior court for Thurston county to review the proceedings of the commission.

The court found, in substance, that the Northern Pacific Railway Company has a line of railroad from Wallula to Puget Sound *via* North Yakima, and that the Oregon-Washington Railroad & Navigation Company has a line from Attalia to North Yakima which approximately parallels the Northern Pacific road. About fifty miles west of Wallula on the Northern Pacific is the town of Prosser, and about the same distance west of Attalia on the Oregon-Washington is the station of North Prosser. At this point the two

railroads are about a mile and one-half apart. Between the two railroad lines at this point, lies the flour mill of Taylor & Kemp, which is distant from the Northern Pacific tracks about one-quarter of a mile, and from the Oregon-Washington Company's depot one mile and a quarter. This mill has been in operation about twenty years, and obtains its wheat for milling purposes in sections of Eastern Washington which are contiguous to both the Northern Pacific and Oregon-Washington railroads. Prior to August, 1912, the grain contiguous to both the Northern Pacific and Oregon-Washington railroads was shipped over these lines to Wallula, where it was turned over to the Northern Pacific for delivery at points on Puget Sound, under a through route and joint rate, with milling in transit privileges to mills along the line, including Taylor & Kemp's mill at Prosser.

After the construction of the Oregon-Washington railroad to North Yakima, the through route and joint rate hereinbefore referred to was withdrawn. Another through route and joint rate with milling in transit privileges was made, but the point of connection between the two roads was at North Yakima instead of Wallula; so that, in order to obtain the advantages of this rate, all grain which originated east of Wallula on the Oregon-Washington railroad was hauled over that road to North Yakima and thence over the Northern Pacific road. Grain moving over this route, if milled in transit at the Prosser mill, was unloaded at North Prosser. To handle the grain from the Northern Pacific to Taylor & Kemp's mill costs twenty cents per ton. To haul grain to the same mill from the Oregon-Washington road costs fifty cents per ton.

It is obvious that Taylor & Kemp are at a greater expense in milling grain received from the Oregon-Washington road than when the grain is received from the Northern Pacific.

The claim of Taylor & Kemp is that they are now in a worse plight than they were before the Oregon-Washington road was constructed, when shipping grain from points east

of Wallula contiguous to the Oregon-Washington lines, since they must now move the grain there originating over the Oregon-Washington road to North Prosser to secure the more advantageous rate; for, if they move the grain over the Oregon-Washington road to Wallula and thence to Prosser on the Northern Pacific, they must pay a higher rate. They further claim that this situation constitutes a discrimination against them and in favor of the mills located at North Yakima and west thereof on the Northern Pacific, because the latter mills can purchase grain at points on either the Oregon-Washington road or the Northern Pacific and ship over either line to North Yakima and thence *via* the Northern Pacific, and in either case they will get the through route and joint rate, and the haul to their mill from the railroad will in each instance be the same. To overcome this alleged discrimination, was the purpose of the complaint of Taylor & Kemp.

Both the Northern Pacific and the Oregon-Washington railroads appeared and opposed this proposed rate, especially the latter, which maintained that such rate would deprive it of the haul from Attalia to North Yakima, and that it was not its fault that Taylor & Kemp's mill was located farther from its depot than from the depot of the Northern Pacific.

After a hearing upon the merits, the commission made the following order:

"Wherefore it is ordered that respondents establish a through route for the transportation of grain, flour and mill feed to be milled at Prosser, Washington, from all points in Washington on the Oregon-Washington Railroad & Navigation Company's lines in Adams, Franklin, Columbia, Garfield and Walla Walla counties and in Whitman county south and west of Winona and on the line from Winona through Colfax and Pullman to the Washington and Idaho boundary line, *via* Oregon-Washington Railroad & Navigation Company's lines, Wallula, Washington, and Northern Pacific railway and from all points on the Camas Prairie Railroad,

*via* Camas Prairie Railroad, Riparia, Washington, Oregon-Washington Railroad & Navigation Company's line, Wallula, Washington, and intermediate points taking the same rate, with milling in transit privileges at Prosser, Washington, subject to milling in transit charge.

"It is further ordered that respondents establish joint rates on grain, flour and mill feed for application over the through routes herein ordered established. This order shall become effective at the expiration of thirty days from date of service hereof."

This is an appeal by both railroad companies from the decree of the lower court affirming the order of the commission.

It is first urged by relators that the order appealed from is so vague and uncertain as to be incapable of enforcement, in that it fails to specify what the rates are to be or whether they are to apply to carload lots or less or both. *State ex rel. La Follette v. Chicago, Milwaukee & St. Paul R. Co.,* 16 S. D. 517, 94 N. W. 406, is relied on to support this rule. That case holds that an order requiring certain railway companies to install transfer connections is too vague and uncertain to be enforced because it fails to state of what material the connections are to be constructed or just where they are to be made. Obviously it has no bearing on an order requiring a certain rate to be made, and in any event the statute does not require that the amount of the rate shall be determined, and, so far as the record shows, the order of the commission has not been superseded, and becomes effective in twenty days by virtue of § 81, ch. 117, Laws of 1911, p. 593 (Rem. Code, § 8626-81). Hence it would be presumed that the order has been complied with, and such compliance would clearly show that it was not too indefinite to be enforced.

Error is also asserted upon the failure of the commission to find that the Oregon-Washington line from Attalia to North Yakima cost $5,000,000, and that, by putting in the through route demanded, all the grain moving over the North

Yakima line could be diverted to the Northern Pacific at Wallula, thus taking away from the Oregon-Washington road the one hundred-mile haul to North Yakima. We think the commission properly refused to make such a finding, in view of the testimony of the general freight agent of the Oregon-Washington road to the effect that the tariff could be so framed that it would not result in the loss of through shipments and would be available only to the mills between Wallula and North Yakima.

It is also asserted that there is no evidence to support the commission's finding of public necessity, because it was shown that Taylor & Kemp were the only persons who appeared at the hearing and asked for the change. We do not wish to hold that the existence of a public necessity is determined by the number of people asking for the same. The case of *State ex rel. Chicago, Milwaukee & Puget Sound R. Co. v. Public Service Commission,* 77 Wash. 529, 137 Pac. 1057, is somewhat analogous to the present situation. Therein it was held that the character of way, whether public or private, is not determined by the extent of the use, and if all the people have a right to use it, no matter if but one person asks for its construction, it is a public way.

Relators complain that the order was beyond the jurisdiction of the commission under the findings. In support of this view, it is argued that milling in transit privileges cannot be claimed by shippers as a matter of right, and that they are no more than privileges granted at the option of the carrier. Assuming this to be the correct rule, relators contend that, since the commission found that the Oregon-Washington road did not enter Prosser, it did not serve the same, and therefore there could be no discrimination against a community it did not serve, either directly or by its own route or by a joint arrangement with other railroads for a through route and joint rate. It appears, however, that Prosser was served by a through route and joint rate by the Oregon-Washington road from points east of Wallula,

and thence over the Northern Pacific through Prosser to the Sound; but this route was higher than the one where the grain was shipped to North Yakima over the Oregon-Washington and thence by Northern Pacific to Puget Sound. The granting of such privileges, however, must be without wrongful prejudice to the rights of shippers in another section served by its line.

Whether or not a milling in transit right is a privilege to be granted at the option of the carrier, the later cases hold that its control is within the jurisdiction of the commission, as evidenced by the following quotation from the case of *In re Transportation of Wool, Hides, and Pelts,* 23 I. C. C. 151, 173:

"In *Koch v. P. R. R. Co.,* 10 I. C. C. 675, decided April 11, 1905, the same ruling was made, in the following terms:

"'Shippers are not entitled as a matter of right to mill grain in transit and forward the milled product under the through rate in force on the grain from the point of origin to the place of ultimate destination, *Diamond Mills Co. v. B. & M. R. R.,* 9 I. C. C. 311, but allowance of the privilege by a carrier to shippers in one section must be without wrongful prejudice to the rights of shippers in another section served by its line.'

"Both these cases were decided under the act as it stood previous to the amendment of 1906. By that amendment the powers of the commission were enlarged and by the subsequent amendment of June 18, 1910, the jurisdiction of this body to deal with matters of this kind was further amplified. At present by the terms of the 15th section—

"'The commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate or rates, charge or charges to be thereafter observed in such case as the maximum to be charged, and what individual or joint classification, regulation or practice is just, fair, and reasonable to be thereafter provided.'

"It is impossible to compare the 15th section as it stood previous to the amendment of 1906, with the same section today, without reaching the conclusion that it was the intention of congress to invest this commission with full au-

thority over interstate rates and whatever regulations or practices entered into those rates and determined their value and availability to individuals or communities.

"Transit is a practice of universal prevalence. There is not probably a railroad in the whole United States handling any considerable amount of business into whose tariffs it is not incorporated. There is not a state commission with authority to establish rates which does not exercise, as a part of that authority, the right to prescribe and enforce proper transit privileges. This commission can not, as tariffs are now constructed and as railroad business is now conducted, properly supervise and regulate the interstate rates and practices of this country without authority over transit."

Under the provisions of Rem. Code, § 8626-53, the state public service commission is given powers very similar to those of the interstate commerce commission, and sufficiently ample to provide the power to regulate milling in transit privileges under the ruling in the case above quoted.

In discussing this problem, ultimately it seems to resolve itself into the question of whether or not Prosser was reasonably served with a milling in transit privilege by the new Oregon-Washington line through North Prosser, as it is admitted by respondents, if Prosser is so served, the public service commission might not have power to divert business from the Oregon-Washington road at Wallula and transfer the same to the Northern Pacific to satisfy the whim of some shipper. It is equally obvious, if the Oregon-Washington road and the Northern Pacific by means of a through route and joint rate are serving the town of Ellensburg and other intermediate points between the originating point east of the Columbia river and destination points on Puget Sound, and not serving Prosser in the same manner and with the same privileges, they are discriminating against the town of Prosser. Whether or not a town is served by a common carrier is more in the nature of a conclusion to be drawn from the actual facts than a fact itself, so that each case must be determined by its own particular facts. In view of

the fact that the Oregon-Washington road does not enter the town of Prosser, and that the alleged service it is now giving the town involves an expenditure of sixty cents a ton or more than would be involved by another service which could be given by relators without any expenditure on their part, we do not think the commission erred in deciding that the town was not properly served by the Oregon-Washington road.

In support of its decision in this matter, the commission stated the following facts:

"Although rates may not be adjusted to equalize differences in relative locations of shippers, this additional transportation expense and unnecessary waste is a proper and material factor to be considered in determining whether or not the existing through route is a satisfactory through route; otherwise a through route passing shippers at a distance of 3, 5 or 10 miles could be successfully defended as a satisfactory through route, notwithstanding the presence of service facilities suitable for forming a through route passing directly through the town in which such shippers may be located, as the Northern Pacific railway line in this instance passes directly through the town of Prosser.

"Other factors for consideration in determining whether or not a through route is a satisfactory through route for transportation of property are:

"A difference in distance on the existing route and the proposed route.

"A difference in cost of transportation over such routes.

"These factors are not present in this case in so far as the rail haul is concerned, but the delay in loading and unloading cars, resulting from the extra wagon haul, equals a material difference in distance on the rail haul, while the difference in transportation cost resulting from the same cause, is equivalent to a substantial difference in rail rates.

"All of the factors here considered are subjects of public service regulation and affect the public necessities and convenience.

"The public necessities and convenience demand the reestablishment of the old through route with milling in transit privileges, for the reason that with a satisfactory through

route and transit privileges grain may be milled at interior points in the state and flour, bran, shorts, chopped and rolled feed and other mill products economically supplied to the various interior communities."

We have given the foregoing quotation from the decision of the commission in this case for the reason that, besides stating some of its arguments, the quotation also contains some findings of fact which we think the commission as an administrative and regulative body has peculiar powers to determine. It is not bound, as is a court, to acquire its information concerning all matters involved in the proceeding before it wholly and entirely from the evidence of witnesses or other evidence produced before it, but may take into consideration the results of its general investigations, general information upon a given subject within its powers, and all matters which affect the matter and concerning which it must determine the facts. The facts stated also seem to furnish some support for the finding of the public necessity and convenience made by the commission and which are asserted by the relators not to exist.

In opposing this conclusion, relators cite *Southern California Sugar Co. v. San Pedro, L. A. & S. L. R. Co.*, 19 I. C. C. 6, and *Enterprise Fuel Co. v. Pennsylvania R. Co.*, 16 I. C. C. 219. In these cases, factories were located voluntarily away from the railroad which they later sought to compel to establish a new through route; which is exactly opposite to the facts in the instant case. As was said in the *Enterprise Fuel Co. v. Pennsylvania R. Co.* case, *supra*:

"May a shipper by locating its yard on another line of railroad but at the same transportation point compel the establishment of a through route? It seems to us that congress had no such end in view when it empowered the commission to form through routes."

Relators also complain that the order takes their property without due process of law. In support of this argument, relators place great reliance on the stock yard cases,

13—95 WASH.

*Central Stock Yards Co. v. Louisville & N. R. Co.*, 118 Fed. 113; Id., 192 U. S. 568, and *Louisville & Nashville R. Co. v. Central Stock Yards Co.*, 212 U. S. 132. These cases all arise out of the same situation and are practically one case. Two stock yards were situated just outside of Louisville, Kentucky. On the line of the Southern railway there were yards known as the "Central Stock Yards," which were used by that railroad as a stock terminal. On the line of the Louisville & Nashville, were located the Bourbon stock yards, which were used by that road as a stock terminal. It does not definitely appear how far apart the two stock yards were, but there was a physical connection between the railroads just outside the city. An attempt was made to compel the Louisville & Nashville to deliver stock shipped over its line to the Southern railway at the point of connection so that it might be unloaded at the Central Stock Yards, and to compel the same railway to receive stock which had been shipped over the Southern railway at this connection and carry it to the Bourbon stock yards, its own terminal. The court refused to compel the railroad companies to do this, as the requirements of the Kentucky constitution to deliver or transfer freight to any point where there is a physical connection between the tracks of railway companies must be construed as referring to cases where the freight is consigned to some further point over a connecting line, and to enforce such an order would be to sanction the snatching of freight from the transporting company at the moment of delivery for the purpose of giving the consignee a more advantageous place of delivery.

Relators ingeniously argue that the only object of the present case was to snatch the transportation of grain from the Oregon-Washington road and give it to the Northern Pacific, so that the place of delivery would be nearer to their mill, and that the stock yards cases and the instant case are therefore similar. But whatever was the ulterior motive of Taylor & Kemp in instituting the present proceeding, they

asked for a through route and joint rate over the Oregon-Washington road to Wallula and thence to Puget Sound, with milling in transit privileges at Prosser, the same as mills west of North Yakima enjoyed, and that was the order entered by the commission from which this appeal is taken. The stock yards cases in no way involved a through joint rate, which is the very essence of the present case. This fact is shown by the following quotation from *Central Stock Yards Co. v. Louisville & N. R. Co.*, 192 U. S. 568:

"The requirement to deliver, transfer and transport freight to any point where there is a physical connection between the tracks of the railroad companies, must be taken to refer to cases where the freight is destined to some further point by transportation over a connecting line."

There is no question of discrimination in favor of other shippers further on in the stock yards cases, as in the instant case, as the object of the stock yards cases was to require the railway company to make final delivery at another depot than its own, and those cases did not involve a review of the order of an administrative board. Courts do not assume regulatory powers in such matters and have none but judicial powers. With regulatory commissions, within their scope their powers are mandatory unless improperly based.

In conclusion, it is suggested that the order is an abuse of the police power in that it can take the private property of an individual only in response to a controlling public necessity and not for the benefit merely of a small group of shippers; relators' argument being that this order demoralizes one hundred miles of railroad for the purpose of saving Taylor & Kemp thirty cents' drayage on traffic. Reliance is placed on *Lake Shore & M. S. R. Co. v. Smith*, 173 U. S. 684, holding that the statute which prescribed maximum passenger fares for passengers and also required the issuance and sale of mileage books was void, as it was an exception in favor of a particular class to carry them at a less rate

than it had a right to charge for those who were not members of such class. In the instant case, the order does not discriminate in favor of Taylor & Kemp, but simply gives them the same privileges they enjoyed before the construction of the Oregon-Washington line to North Yakima, and the same privileges enjoyed by mills west thereof.

Certain other cases, such as *Wisconsin, M. & P. R. v. Jacobson*, 179 U. S. 287, and *State ex rel. Oregon R. & Nav. Co. v. Fairchild*, 224 U. S. 510, to the effect that, while the interstate commerce commission may require railway companies to make track connections, it must be determined with a just regard to the advantage to be gained by the public and the expense to be incurred by the carrier, are relied on by relators, because it is claimed that the advantage to be derived by Taylor & Kemp is very slight in comparison with the amount of traffic that would necessarily be snatched away from the Oregon-Washington road. The cases above cited, being track connection cases, involve an expenditure of money, which condition is absolutely lacking in the instant case. In answer thereto, relators assert that the order deprives them of the transportation of grain and the profits to be made thereby, which is equivalent to the expenditure of money. In view of the freight agent's testimony before referred to, that the tariff could be so framed that it would not result in the loss of through shipments and would only be available to the mills between Wallula and North Yakima, and especially in view of the fact that only sixteen cars came over the Oregon-Washington road to Taylor & Kemp at North Prosser last year, we do not think the amount of transportation so taken away from the Oregon-Washington company very large, or enough to seriously cripple its business, or even to overcome the equities of Taylor & Kemp, who certainly are not in as good a position as they were before the North Yakima extension of the Oregon-Washington road was constructed, and are not enjoying the same privileges as their competitors west of North Yakima to which they

were equally entitled, and that therefore without doubt they
were discriminated against.

In the case of *Atlantic Coast Line R. Co. v. North Caro-
lina Corporation Commission*, 206 U. S. 1, will be found as
extreme a case in support of the regulatory powers of a
state commission as we have ever noticed.   In that case, two
railway companies ran a number of trains one of each com-
pany having for a long time made connections at a place
called Selma.   One of the companies discontinued its train
connecting at this point, and the Atlantic Coast Line was
ordered by the state commission to inaugurate a train serv-
ice that would make connection with a certain train of the
Southern Railway Company at Selma, although it was shown
that for the Atlantic Coast Line company to inaugurate this
train service would require it to put on an extra train to run
from a certain place to Selma which would cost forty dollars
per day, and that the probable daily receipts from such train
would not be to exceed twenty-five dollars per day.   The su-
preme court of North Carolina, upon appeal from the judg-
ment of reversal by a lower court of the order of the state
commission, reversed the lower court and affirmed the com-
mission, and the decision of the supreme court of the United
States affirmed that of the supreme court of North Carolina.
Among other observations found in the decision of the su-
preme court of the United States, are these (pages 19-26):

"The elementary proposition that railroads, from the pub-
lic nature of the business by them carried on, and the in-
terest which the public have in their operation are subject,
as to their state business, to state regulation, which may be
exerted either directly by the legislative authority or by ad-
ministrative bodies endowed with power to that end, is not
and could not be successfully questioned in view of the long
line of authorities sustaining that doctrine.   .   .   .   [It is
contended]

"(1)    *That the order was arbitrary and unreasonable,
because beyond the scope of the authority delegated to the
corporation commission by the state law.*

"As this proposition involves no Federal question and is concluded by the judgment entered below, we put the subject out of view. . . .

"(2)   *The order was arbitrary and unreasonable, because when properly considered it imposed upon the Coast Line a duty foreign to its obligation to furnish adequate facilities for those traveling upon its road.*

"This rests upon the assumption that as the order was based not upon the neglect of the Coast Line to afford facilities for travel over its own road, but because of the failure to furnish facilities to those traveling on the Coast Line who desired also to connect with and travel on the Southern road, therefore the order was in no just sense a regulation of the business of the Coast Line. This reduces itself to the contention that, although the governmental power to regulate exists in the interest of the public, yet it does not extend to securing to the public reasonable facilities for making connection between different carriers. But the proposition destroys itself, since at one and the same time it admits the plenary power to regulate and yet virtually denies the efficiency of that authority. That power, as we have seen, takes its origin from the *quasi*-public nature of the business in which the carrier is engaged, and embraces that business in its entirety, which of course includes the duty to require carriers to make reasonable connections with other roads, so as to promote the convenience of the traveling public. . . . we conclude that the order in question, considered from the point of view of the requirements of the public interest, was one coming clearly within the scope of the power to enforce just and reasonable regulations.

"(3)   *That the facilities afforded the public by the railroad were of such a character as to demonstrate that the extra burden which would result from the compliance with the order was wholly arbitrary and unreasonable.*

"This rests upon the assumption that as there were several existing daily connections between trains of the Coast Line and those of the Southern at Selma, which might be availed of by those desiring to travel from eastern to western North Carolina, and beyond, and, as besides, the proof established that another connection operating the same result was afforded by way of Weldon and the Seaboard Air Line to Raleigh and thence further west, therefore it was both

arbitrary and unreasonable to superadd an unnecessary connection. Conceding, as must be done, that the nature and extent of the existing facilities furnished by the public convenience are essential to be considered in determining whether an order directing an increase of such facilities must clearly appear to justify an order directing the furnishing of new and additional facilities, we think the proposition here relied on to be without merit. . . .

"(4) *That, however, otherwise just and reasonable the order may have been, it is inherently unjust and unreasonable because of the nature of the burden which it necessarily imposes.*

"This proposition is based on the hypothesis that the order, by necessary intendment, directed the Coast Line to operate an additional train, although such train could not be operated without a daily pecuniary loss. The premise upon which this proposition rests would seem to be irrelevant, since the court below in one aspect of its opinion treated the order of the commission as not requiring the operation of an extra train from Rocky Mount to Selma. Yet, as the facts found by the commission and which were affirmed by the court would indicate that it was considered that the operation of such train was the most direct and efficient means for making the ordered connection, and as the court considered and passed upon the duty of the railroad to comply with the order, even if to do so it became necessary to operate the extra train at a loss, we think the proposition relied upon is open and must be decided. The contention is that the fact that some loss would result from the requirement that the extra train be operated, in and of itself, conclusively establishes the unreasonableness of the order and demonstrates that to give it effect would constitute a taking of property without due process of law in violation of the Fourteenth Amendment. . . .

"But this case does not involve the enforcement by a state of a general scheme of maximum rates, but only whether an exercise of state authority to compel a carrier to perform a particular and specified duty is so inherently unjust and unreasonable as to amount to the deprivation of property without due process of law or a denial of the equal protection of the laws. In a case involving the validity of an order enforcing a scheme of maximum rates of course the finding

that the enforcement of such scheme will not produce an adequate return for the operation of the railroad, in and of itself demonstrates the unreasonableness of the order.    Such, however, is not the case when the question is as to the validity of an order to do a particular act, the doing of which does not involve the question of the profitableness of the operation of the railroad as an entirety. . . . as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, as would be the case where the whole scheme of rates was unreasonable under the doctrine of" [former cases].

The order of the commission was sustained in entirety in the above case.    While that case was not upon the same question as that here involved, the reasoning therein is very pertinent.    The through joint rate and milling in transit privilege is a facility granted by railroads.    A through joint rate is a public necessity and a milling in transit privilege a facility which may become public by reason of its use.    Here we have a situation showing such a facility granted by the railroads to some communities and denied to another.    We cannot escape the conclusion from such a situation that the through joint rate and milling in transit facility is as much a public necessity at Prosser as it is at North Yakima.    Being granted at North Yakima and denied at Prosser, there is a public discrimination.    Such being the case, we think the public service commission acted wholly within its powers when it found the facts sustaining its order and ordered that a through joint rate and milling in transit privilege be granted by the railroads to the complainant at Prosser.

The judgment of the lower court and the order of the commission are therefore affirmed.

ELLIS, C. J., MOUNT, and PARKER, JJ., concur.

On Rehearing.

[*En Banc*.   August 3, 1917.]

Per Curiam.—Upon a rehearing *En Banc*, a majority of the court still adhere to the opinion heretofore filed herein, and for the reasons there stated, the judgment is affirmed.